ROBERT H. PLATT (Bar No. CA 108533)
rplatt@manatt.com
DONALD R. BROWN (Bar No. CA 156548)
dbrown@manatt.com
ALEXANDRA N. HILL (Bar No. CA 313249)
ahill@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

Attorneys for *Plaintiff*
HERBALIFE INTERNATIONAL OF AMERICA, INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>EASTERN COMPUTER EXCHANGE, INC., a Connecticut corporation, and GERRY BERG, an individual, residing in the State of Pennsylvania,<br><br>Defendants. | Case No. 2:22-cv-347<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUDULENT CONCEALMENT;**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) BREACH OF CONTRACT;**<br>**(4) CONVERSION; and**<br>**(5) DECLARATORY RELIEF.** |

Plaintiff Herbalife International of America, Inc. ("Herbalife"), for its Complaint herein, states and alleges as follows:

### THE PARTIES

1.      Plaintiff Herbalife is a Nevada corporation with its principal place of business in Los Angeles, California.

2.      Defendant Gerry Berg ("Berg") is an individual who, on information and belief, currently resides and is domiciled in Pennsylvania.

3.      Defendant Eastern Computer Exchange ("Eastern") is a Connecticut corporation with its principal place of business in Westport, Connecticut.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. Section 1332 because there is complete diversity between Herbalife, Eastern, and Berg, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court pursuant to 28 U.S.C. Sections 1391(b) and 1400 because a substantial part of the events giving rise to the claims occurred in this judicial district, and Herbalife's principal place of business is within this judicial district. Eastern and Herbalife entered into a Master Services Agreement ("MSA") providing that "any and all disputes arising under this Agreement shall be adjudicated in the appropriate state or federal court within California." Eastern and Herbalife also entered into a Non-disclosure Agreement ("NDA") providing that "all disputes arising from or relating to this Agreement [shall be subject] . . . to the exclusive venue and jurisdiction of, the state and federal courts of Los Angeles County, California."

6.      Venue is also proper in this Court because Berg and Herbalife entered into a confidentiality agreement (the "Confidentiality Agreement") that "any action to enforce or interpret it, or otherwise arising from it, shall be initiated and maintained in a court in the County of Los Angeles . . . . "

**COMPLAINT**

## FACTUAL BACKGROUND

### General Allegation

7.     In furtherance of a fraudulent scheme, defendant Berg conspired with Eastern to provide Eastern an unfair advantage to the detriment of Herbalife.

### Herbalife's Robust Procurement Policies and Procedures

8.     Herbalife is a global nutrition company that, through its network of independent distributors, provides consumers with nutrition solutions in the areas of weight management, sports nutrition, and health and wellness.  Herbalife has been in operation for over 41 years and is currently a New York Stock Exchange publicly traded company operating in 95 markets globally.

9.     Herbalife has robust and detailed written procurement policies and procedures that all employees must follow.  Pursuant to these policies and procedures, Herbalife engages thousands of vendors to provide goods and services to Herbalife in a fair and consistent manner.

10.     Herbalife's procurement policies and procedures contain extensive requirements.  Herbalife's procurement procedures require, among other things, a number of written approvals by specified employees before a vendor can be awarded a contract. Berg was advised that before capital expenditures could be made through a third party vendor, Herbalife's policies and procedures required the following: 1) an approved Project Authorization Request or "PAR"—that is, approval of the proposed total expenditure on the overall project; 2) an approved purchase requisition or "PR"—that is, approval for the specific purchase tied to the project for which there is an approved PAR; and 3) an approved Purchase Order or "PO" for the vendor, tied to the project and purchase for which there is already an approved PAR and PR, which represents Herbalife's purchase commitment to the vendor.

11.     The PAR, PR, and PO must all be approved in writing by the specifically designated employees at Herbalife with approval authority. Multiple approvals may be required, including by senior management and the Board of Directors ("Board"),

2

depending on the size of the expenditure.

12.    To ensure that all of these required procurement policies and procedures were followed, Herbalife used database systems to record and maintain PARs, PRs, and POs.  For example, a PO cannot be issued using Herbalife's Oracle database unless all of the required approvals have been obtained for both the associated PAR and PR.

13.    The Oracle database sequentially assigns a unique number to a PO based on the date of creation of the PO. Once all of the requisite approvals are obtained, and a PO is able to be issued, an employee of Herbalife typically sends a copy of the PO to the vendor from the Oracle system.  All PARs, PRs, and POs, including all written authorizations for such documents, are stored on Herbalife database systems.

14.    These procurement procedures and procedures were designed by Herbalife to promote transparency and to ensure that projects being bid were within the company's budget, met the company's stated needs, and were subject to fair competitive bidding.

**Herbalife Hires Berg, Who Is Made Aware of Herbalife's Policies and Procedures**

15.    In late 2019, Berg discussed a potential employment opportunity for Berg to work at Herbalife.  On or around January 6, 2020, Berg accepted an at-will position as Vice President of Infrastructure & Operations at Herbalife, reporting directly to the Chief Information Officer.

16.    As part of Berg's onboarding process, Berg had access to, and was required to be familiar with, Herbalife's procurement policies and procedures identified above.

17.    Berg was well-aware of Herbalife's procurement policies and procedures. In fact, in May 2020, an employee of Herbalife made a complaint against Berg alleging that Berg had not followed Herbalife's procurement policies and procedures in connection with work awarded to Eastern.  Herbalife investigated the complaint and found that Berg, among other things, had not competitively bid some of the services awarded to Eastern, in violation of Herbalife's procurement policies and procedures. Berg, thus, was reminded of Herbalife's procurement policies and procedures, and instructed that in the future Berg must follow Herbalife's procurement policies and procedures.

3

**COMPLAINT**

18.     Upon hire, Berg also signed the Confidentiality Agreement wherein Berg agreed not to share Herbalife's confidential information with "any third party, except, when necessary, in the course and scope of his/her employment and in furtherance of [Herbalife's] business." *See* Exhibit 1.

### Eastern Signs a MSA

19.     On information and belief, Eastern is a technology company based in Westport, Connecticut. Eastern is what is known as a "value added reseller" or "VAR," which partners with original equipment manufacturers ("OEMs") such as Dell Technologies, to resell computer equipment to end users such as Herbalife.

20.     Berg had a history of working with Eastern at companies where he was previously employed.  During that time, Berg developed a close personal relationship with, among other individuals at Eastern, Eastern's president, Brendan Lynch ("Lynch").

21.     In late 2019, Eastern was introduced to and became an Herbalife vendor for the first time. Herbalife and Eastern signed the NDA, effective December 13, 2019, strictly prohibiting the parties from using any confidential information of the other. *See* Exhibit 2. Herbalife and Eastern also signed the MSA in January 2020.  Berg signed the MSA, although it was backdated to December 19, 2019, before his employment commenced with Herbalife. *See* Exhibit 3.

### Herbalife Issues 21 Purchase Orders to Eastern

22.     Starting January 2020 through April 2021, Herbalife entered into 21 different POs with Eastern and paid Eastern over $15 million in connection with those POs.  Eastern, thus, was well aware of the necessity of Herbalife issuing a PO before any payments could and would be made by Herbalife.

### Eastern Receives a Purchase Order to Conduct an Analysis of
### Herbalife's Business Continuity and Disaster Recovery Strategy

23.     Business continuity and disaster recovery ("BCDR") generally refers to a strategy to reduce the risk of technology outages that could disrupt a business.  Herbalife retained Eastern in or around April 2020, pursuant to a PO, to perform an "application

4

impact analysis" ("AIA") of Herbalife's BCDR systems in both its Salt Lake City and Winston-Salem database locations.  Herbalife paid Eastern for the AIA in accordance with the PO issued for it.

24.     Eastern provided Herbalife the AIA report, with its BCDR design recommendations, on or around June 18, 2020.  The June 18, 2020 Eastern AIA report made two recommendations for potential BCDR solutions for Herbalife's computer systems located in Salt Lake City and Winston-Salem.  In its AIA report, Eastern stated it would make a proposal "in 4 weeks" (by July 18, 2020) to address the BCDR strategy for both Salt Lake City and Winston-Salem.  Notably, both design solutions recommended by Eastern would have Herbalife commit significant resources to an on-premises, primarily hardware-focused solution (i.e., use vendors such as Eastern to purchase hardware and equipment from OEMs like Dell), rather than a cloud-based solution.

**Herbalife's Board of Directors Reviews BCDR Strategy**

25.     During the summer and into the fall of 2020, a team of Herbalife employees, including Berg, prepared a presentation for Herbalife's Board of Directors (the "Board") on BCDR.  The presentation addressed various BCDR recommendations for both the Salt Lake City and Winston-Salem locations.  The purpose of the presentation to the Board was to present management's recommendations related to BCDR and to seek Board approval for funding a BCDR project, consistent with Herbalife's policies and approval process.

26.     The presentation requested the Board to approve $40 to $50 million to address BCDR.  The presentation noted that the "cost projections represent estimated maximum spend, ***as no negotiating has been initiated*** (of which $20 million is [capital expenditures] and the remainder is maintenance and support)." (Emphasis added.) At this Board meeting, which Berg did not attend, the Board approved a preliminary budget to address BCDR.

**Berg Meets with Eastern on October 28, 2020**

27.     Unbeknownst to his supervisor, Berg had arranged for Eastern (Lynch and

5

**COMPLAINT**

Marty O'Brien ("O'Brien"), Eastern's Regional Sales Director), to meet at Herbalife's office in Torrance on October 28, 2020.

28.     The October 28, 2020 meeting was attended by Gerry Berg, Peter Bray ("Bray"), Herbalife's Senior Director of Strategy and Governance, as well as Lynch and O'Brien.  Because Bray had been recently hired and had been primarily working remotely at Herbalife, the meeting was Bray's first time in Herbalife's office, as well as Bray's first-time meeting Berg, Lynch, and O'Brien in person.  Bray was unaware of the purpose of the meeting.

29.     As of October 28, 2020, there was no PAR, PR, or PO issued for the BCDR project; therefore, neither Bray nor Berg had any authority to approve Eastern ordering any equipment for the proposed BCDR project.

30.     Nevertheless, Eastern (Lynch and O'Brien) raised the possibility of Eastern pre-ordering BCDR equipment during the October 28, 2020 meeting.  More specifically, Eastern suggested that it purchase equipment from Dell on behalf of Herbalife before Herbalife had approved a PAR, PR, or PO for the equipment.  During this meeting, Bray told Lynch and O'Brien that he wouldn't take such an approach, but that if Eastern nevertheless did so, and chose to pre-order BCDR equipment, that such a decision would be "on them."

31.     Although the Board approved the initial spend, Herbalife's policies nevertheless require employees to follow its required approval process, which includes a PAR, PR, and PO.   Berg and Bray knew well that no one could bypass this process and approve a "verbal order" for the purchase of the BCDR equipment.  This was especially so given the significant size of the expenditure.  Eastern likewise knew that it must receive a PO, in writing, from Herbalife, just as it had many times for prior orders.

32.     While Defendants now claim that Bray placed a "verbal order" for tens of millions of dollars of BCDR equipment at this October 28 meeting, without a PAR, PR, or PO, this contention is belied by many facts.  Bray steadfastly denies that he approved a verbal order.  Moreover, Berg, not Bray, was the project lead for BCDR, had the prior

6

**COMPLAINT**

400958382.1

relationship with Eastern, and convened the October 28, 2020 meeting.  Moreover, unlike Berg, Bray did not have a vice president title.  Finally, Berg certainly was aware that Bray, who was below Berg in the Herbalife hierarchy, and had just recently joined the company, could not unilaterally ignore Herbalife's procurement policies and procedures and place a verbal order worth tens of millions of dollars.

33.   On October 30, 2020, Eastern, without Herbalife's knowledge or authorization, placed an order in excess of $20 million worth of computer hardware from Dell, supposedly for Herbalife's BCDR project.

34.   It is abundantly clear that Berg and Eastern understood that they did not have the authority to proceed with the order and spend millions of dollars on the BCDR project.   There is no evidence confirming or even mentioning this supposed verbal agreement anywhere at Herbalife.  Herbalife has been unable to locate even a single email evidencing an agreement between Eastern and Herbalife to purchase the BCDR equipment, and there is no written agreement to this effect.  It is inconceivable that a deal worth tens of millions of dollars, potentially involving dozens of Herbalife employees, would leave no paper trail at Herbalife.  It appears that all communications, if any, regarding Eastern's ordering of the equipment from Dell were conducted on non-Herbalife devices in an apparent effort to conceal the transaction.

**Herbalife Issues a RFP for BCDR Strategy**

35.   Herbalife, unaware that Eastern had placed an order for certain BCDR equipment, began the formal process of searching for a vendor to fulfill its BCDR needs after the Board approved an initial BCDR spend.  As required by its policies and procedures, Herbalife conducted a request for proposals ("RFP") process in November 2020 for the BCDR project.  Herbalife invited vendors to bid on the BCDR project, including Eastern.

36.   In November 2020, Herbalife provided the vendors participating in the RFP with highly confidential information about its computer systems, including information related to data processing, data protection, and business continuity capabilities, to allow

**COMPLAINT**

400958382.1

the vendors to fully diagnose Herbalife's needs and provide bids to address BCDR strategy. The bid for the BCDR project was for the entire project, not phases.

37.     At no time during the RFP process did Eastern or Berg ever mention that Eastern had already allegedly been awarded all or part of the BCDR project, nor did Eastern or Berg ever mention that it had already ordered equipment from Dell. To the contrary, along with other vendors invited to participate in the RFP, Eastern prepared and submitted a response to the RFP.

38.     Indeed, Eastern's full participation in the RFP process for BCDR—from November 2020 through January 2021—undermines its position that Eastern had some type of verbal commitment from Herbalife in October 2020 to order the BCDR equipment. Even more perplexing, is that Eastern now claims that Herbalife informed Eastern that it had won the RFP in mid-December 2020—which, again, runs contrary to Eastern's decision to order tens of millions of dollars of equipment from Dell in October 2020. Eastern's contentions are further belied by email communications between Eastern and Herbalife, which demonstrate that, as of January 2021, there were still discussions between Herbalife and Eastern regarding Eastern's potential bid for the entire BCDR project. Thus, it was clear based on Eastern's conduct that Eastern had not been announced as the "winner" of the RFP prior to October 2020 or at any time whatsoever.

**Herbalife Circulates BCDR PAR in January 2021, Further Demonstrating That There Was No Approval of the BCDR Project**

39.     In accordance with Herbalife's policies and procedures, on January 20, 2021, a PAR for the entire BCDR project was submitted for approval.

40.     Given the size of the BCDR project, the PAR required written approval from numerous employees, up to and including both the President, as well as the Chairman/CEO. Berg was one of 15 Herbalife employees whose authorization was required to approve the PAR.

41.     On January 27, 2021, Berg recorded his approval of the PAR in the Oracle system. At no time did Berg disclose that he was aware that Eastern had already ordered

**COMPLAINT**

400958382.1

the BCDR equipment from Dell.

42.     The PAR did not receive approval from all 15 individuals required and, therefore, there was no authorization from Herbalife for Eastern or any vendor to proceed with the BCDR project.

**Herbalife Terminates the RFP Process**

43.     Herbalife decided to terminate the RFP without awarding the contract to any vendor in January 2021 to further assess the proposed BCDR project design.  Later that month, Herbalife decided to engage a neutral third-party to review and assess the proposed BCDR project design.  Berg expressed his extreme displeasure regarding Herbalife's decision to retain a third party to independently assess the BCDR project.

44.     That same month, Eastern and the other bidders were advised that the RFP process was put on hold.  No vendor was selected, and the bidding process was terminated to avoid a tainted process and allow Herbalife to further scrutinize its BCDR solution options.

**Berg Delivers a Fraudulent PO to Eastern**

45.     On information and belief, Dell asked Eastern for proof that Herbalife had committed to the multi-million dollar purchase of computer hardware through Eastern from Dell for Herbalife's BCDR strategy.

46.     On information and belief, desperate to get a PO from Herbalife, Lynch conspired with Berg to create a fraudulent PO wrongly suggesting that Herbalife had authorized Eastern to purchase the BCDR computer hardware from Dell. On February 23, 2021, Berg hand delivered to Lynch a fraudulent PO backdated to October 30, 2020. According to a sworn declaration provided by Lynch, "[o]n or about February 23, 2021, Gerry and [Lynch] met with a mutual friend for a dinner meeting, as [they] have done for many years.  Just prior to the dinner meeting, [Lynch] asked Gerry if he could bring [Lynch] any written acknowledgement of the BCDR Equipment Order so [Lynch] could show it to Dell, as requested.  Gerry brought [Lynch] a document that memorialized the October 28, 2020 BCDR Equipment Order."

**COMPLAINT**

47.     On information and belief, Eastern then provided the fraudulent PO to Dell for the purpose of falsely confirming Herbalife's BCDR equipment order.

48.     Not surprisingly, the fraudulent PO provided by Berg to Eastern does not exist anywhere in any of Herbalife's files or Oracle database. The fraudulent PO is not in Herbalife's Oracle database and was not transmitted through Herbalife's email systems to anyone at Herbalife or to any third party. Moreover, there is no record of any actual PO being issued to Eastern on or around October 30, 2020, nor is there any record of any PO being issued to Eastern for any project close to $20 million, including BCDR.  This is not surprising, as there was never an approved PAR or PR issued for the BCDR order; thus, there could not have been an approved PO issued for any equipment order related to BCDR.

49.     The fraudulent PO that was delivered by Berg to Eastern on February 23, 2021 was identified with the PO number 1102051762.  This PO number was originally issued by Herbalife to Eastern for a completely different project.  The original PO was redacted, and new language for the fraudulent PO inserted, to disguise the fact that the fraudulent PO was in fact fabricated.  Though not immediately apparent at first blush, upon closer review, the fraudulent PO was also riddled with errors, further underscoring its fraudulent nature. The Payment Terms on page 1 ("60 on Delivery in Full") do not match the Payment Terms on pages 2 and 3 ("30"). Under the word "Release" on the front page, the text "Page 1 of 3" is missing, but would be included on Herbalife POs. The PO contains vague language rather than identifying specific equipment that would be ordered. Nevertheless, this fraudulent PO was delivered by Eastern to Dell as evidence that Eastern had an "agreement" with Herbalife to order the Dell equipment.

**Herbalife Hires Deloitte to Reevaluate Herbalife's BCDR Needs**

50.     In February 2021, Herbalife hired Deloitte to analyze its BCDR needs. Deloitte was retained to make independent recommendations without any financial incentives.   Throughout the month of March 2021, confidential meetings occurred between representatives of Deloitte and Herbalife to evaluate the proposed BCDR project.

10

**COMPLAINT**

It was made clear to participants, including Berg, that these meetings and the information shared during these meetings with Deloitte were highly confidential. Eastern was not invited to, and did not attend, these meetings.

51. At these meetings between Herbalife and Deloitte, various alternative BCDR solutions were discussed. Berg, who attended the meetings with Deloitte, never advised anyone at Herbalife or Deloitte that, allegedly, Eastern had already been awarded the BCDR contract, or that Eastern had already ordered the BCDR equipment. Berg had a fiduciary obligation to disclose to Herbalife that he understood that Eastern had already ordered tens of millions of dollars of BCDR equipment. Despite attending a series of meetings between Herbalife and Deloitte, Berg kept the alleged Eastern order a secret.

52. At these meetings between Deloitte and Herbalife, which Berg attended, different solutions regarding BCDR were discussed, including a cloud-based solution that would render the Eastern equipment purchase unnecessary.

53. On March 31, 2021, Deloitte sent an "executive readout" PowerPoint deck to the Chief Information Officer, who then forwarded the deck to her direct reports, including Berg, the next day. The executive readout makes clear that Deloitte was recommending that Herbalife consider options other than a hardware-heavy BCDR solution that would rely on vendors like Eastern and Dell.

54. Realizing that, with Deloitte's involvement, a different BCDR solution might be selected that would render Eastern's equipment purchase unnecessary, Berg panicked and began displaying aggressive and hostile behavior at the meetings with Deloitte. At one meeting with Deloitte in March 2021, Berg became so enraged that he slammed his hand on a table in outrage. Such aggressive and unprofessional behavior compelled Herbalife executives to later apologize to representatives from Deloitte.

**Berg Is Terminated**

55. Berg's unprofessional and aggressive behavior was observed by and also reported to senior management. Ultimately, Herbalife decided to terminate Berg's at-will employment on or about April 9, 2021. As part of his separation, Berg signed a

11

**COMPLAINT**

"Proprietary Information" agreement ("Proprietary Information Agreement") which stated that "any proprietary information which you may have obtained regarding Herbalife International of America, Inc. or its affiliates, as a result of your employment is to be held in strictest confidence." *See* Exhibit 4.

56.    On April 27, 2021, 18 days after he was terminated, Berg forwarded a copy of the confidential Deloitte deck to Eastern from his personal Gmail account. There is no record of Berg ever emailing a copy of the presentation from his Herbalife email account to his personal Gmail email account; it appears that Berg must have used another method to transfer Herbalife materials to his personal device to avoid detection.

**Herbalife Discovers the Fraudulent PO**

57.    Herbalife was unaware of the fraudulent PO or any order for BCDR equipment placed by Eastern.  In July 2021, a Dell executive reached out to Herbalife requesting to speak about a "situation" that had arisen with Eastern.

58.    The Dell representative explained that Dell had been informed by Eastern that Herbalife had placed a "firm order" via a PO numbered 1102051762 for BCDR equipment.  The Dell representative further explained that Dell had built over $20 million worth of computer equipment based on Eastern's representations.   The Dell representative also informed Herbalife that Eastern had refused to accept delivery or pay for the BCDR equipment, causing a dispute between Dell and Eastern.  At Herbalife's request, Dell sent the PO numbered 1102051762—*the fraudulent PO*—to Herbalife, which led to Herbalife's discovery of the fraud.

**Eastern Settles Its Dispute with Dell**

59.    On information and belief, Dell and Eastern entered into a settlement and release agreement in which the parties released each other from any and all claims in connection with Eastern's BCDR order with Dell on Herbalife's behalf.  On information and belief, Dell did not charge Eastern for the equipment nor did it charge Eastern for any restocking fees.

///

**COMPLAINT**

400958382.1

**Eastern Seeks Compensation**

60.     Despite its fraudulent acts, and despite being released from all claims by Dell, Eastern seeks to benefit from its fraudulent conduct by charging Herbalife fees in connection with its fraudulent BCDR order from Dell.  Eastern now seeks millions of dollars from Herbalife in payment for the BCDR project, including equipment and labor. Eastern also has demanded that Herbalife pay $2,267,476.86 to account for purported "restocking fees," as well as other alleged fees, such as "financing fees," allegedly charged by Dell to return the equipment Eastern ordered without authorization in October 2020.  On information and belief, no such fees were charged.

61.     Eastern is also seeking payment for $1,074,915.62 in tokens and licenses Eastern purchased from a company called VMware allegedly on Herbalife's behalf.  The agreement entered into between Eastern and Herbalife specifically provides that Herbalife is only responsible to pay for such tokens and licenses when they are ordered pursuant to a purchase order.  However, Herbalife has never issued a PO (i.e., Herbalife has never given corporate approval) to purchase any of the VMware tokens or licenses for which Eastern is now seeking payment; therefore, no money is due or owing to Eastern for the purchase of such tokens.

**Eastern Has Breached the NDA and MSA with Herbalife**
**by Engaging in Fraudulent and Unethical Conduct**

62.     Paragraphs 2(B) and 5(v) of the MSA between Herbalife and Eastern state in pertinent part:

> Contractor [i.e., Eastern] hereby agrees to perform the Services in a conscientious and professional manner and to the best of Contractor's ability . . .

> [Eastern] will perform the Services in a workmanlike manner.

63.     The conduct alleged herein and above breaches Eastern's contractual obligation under the MSA to perform its services in a conscientious, workmanlike, and professional manner to the best of Eastern's ability.

64.     Furthermore, the Deloitte meetings, including the PowerPoint deck, qualify

13

**COMPLAINT**

as "Confidential Information" under the NDA signed by Herbalife and Eastern. Paragraph 2, "Confidential Information," of the NDA broadly defines Confidential Information as:

> . . . any nonpublic, confidential or proprietary information that the Disclosing Party or any of its representatives, employees, agents, affiliates, or financial, legal, or accounting advisors (together, the "Representatives") make available to the Receiving Party in connection with the Services. Such Confidential Information shall include, but is not limited to the following: business and strategic plans, market analysis, business summaries, business processes, financial forecasts and reports, product formulas, ingredients, clinical studies, prospective product designs, pricing policies and methods, vendor and business partner identities, purchasing methods and Information, operational material and manuals, financial data, proposed trademarks or service marks, patent applications, trade secrets, technical and engineering data, drawings, models, software products, and design and technical specifications.

65. Paragraph 5 of the NDA between Herbalife and Eastern states, in pertinent part, that Eastern (i.e., the "Receiving Party") will:

> (a) not use Confidential Information for any purpose whatsoever other than evaluation and/or facilitating discussions between the Parties; (b) not copy the Confidential Information, reproduce it in any form or store it in a retrieval system or database without the prior written consent of the Disclosing Party, subject to the exceptions contained herein; (c) keep in confidence all Confidential Information received, and not distribute, disclose, or disseminate such Confidential Infonnation [sic] in any way to anyone except to the minimum number of Representatives of the Receiving Party with a need to know and who are involved in a consideration or evaluation of the Confidential Information; *provided however*, that such Representatives have been advised of the obligations to protect the Confidential Infonnation [sic], and *provided further*, that notwithstanding the foregoing, the Receiving Party shall be liable for any misuse of such Confidential Infonnation [sic] by such Representatives; (d) use reasonable care to protect the Confidential Information, and in no event use less than the same degree of care as the Receiving Party safeguards its own Confidential Information of like kind . . . .

66. Herbalife is informed and believes that Eastern used confidential information gained before, during, and after the bidding process which was a breach of the NDA. Herbalife is informed and believes that Eastern conspired with Berg to orchestrate a situation in which Eastern would ultimately be able to win the BCDR bid and be able to

14

**COMPLAINT**

pay Dell for its unauthorized order.

**FIRST CAUSE OF ACTION**

**Fraudulent Concealment**

**(Against Defendants)**

67. Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

68. Eastern and Berg conspired to falsely and fraudulently conceal from Herbalife that they were secretly conspiring to divert the BCDR business to Eastern, including by creating a fraudulent PO, and concealing such activities from Herbalife (nor could Herbalife have discovered them).

69. When Berg and Eastern entered into the conspiracy, Defendants failed to disclose such fraudulent conduct to Herbalife. Defendants knew their actions to be fraudulent, and Defendants concealed the truth from Herbalife with the intent to defraud and deceive Herbalife and with the intent to induce Herbalife to act in the manner herein alleged.

70. At the time of the fraudulent omissions by Berg, with the participation and knowledge of Eastern, and at the time Herbalife engaged in the actions herein alleged, Herbalife was ignorant of the actions being undertaken by Defendants, believed that Defendants were acting in the best interests of Herbalife, and relied upon Defendants in continuing to employ and compensate Berg and Eastern.

71. Herbalife did not discover the fraudulent concealment advanced by Eastern and Berg until Dell contacted Herbalife in the summer of 2021.

72. Berg and Eastern intended to deceive Herbalife by concealing their conspiracy and fraudulent PO. Berg and Eastern were careful not to create a "paper trail" of its fraudulent conduct. There are no emails on the Herbalife computer system referencing or even mentioning the multi-million dollar order that Herbalife allegedly placed with Eastern. Furthermore, Berg failed to disclose during the RFP process that Eastern had already ordered the equipment that was subject to the RFP. When Berg

15

approved the PAR on January 27, 2021, Berg failed to disclose to anyone at Herbalife that he believed that Eastern had already ordered the equipment from Dell. Moreover, when Deloitte was retained in early 2021 to evaluate potential solutions for BCDR, Berg failed to mention that tens of millions of dollars of equipment had already been ordered by Eastern from Dell. Berg did not obtain any of the required approvals to make an equipment order. Berg's concealment caused significant damage to Herbalife in an amount to be proven at trial.

73.    Throughout 2020 and 2021, Berg acted as if Eastern had not been allegedly awarded the BCDR bid and that Eastern had not placed an equipment order with Dell. Berg participated in the Board presentation, the RFP process, the PAR approval process, and attended meetings with Deloitte, without ever mentioning his understanding that the BCDR project had already been awarded to Eastern and that Eastern had already placed the equipment order.

74.    Had Herbalife known of the actions being undertaken by Defendants, Herbalife would have behaved differently.

75.    As a result of Defendants' wrongful conduct, Herbalife has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, Eastern's invoice(s) for equipment return, financing charges, and/or restocking fees, among other damages, all in an amount to be determined according to proof at the time of trial.

76.    Defendants committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive Herbalife of its property, and their concealment was a substantial factor in causing Herbalife's harm. Herbalife is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial.

77.    WHEREFORE, Herbalife prays for relief as set forth below.

**COMPLAINT**

400958382.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**(Against Defendants)**

78.    Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

79.    At all relevant times, Berg was a Vice President and officer of Herbalife and had a fiduciary duty to (1) use reasonable care in the performance of his duties, (2) exercise undivided loyalty to his employer, and (3) maintain the confidentiality of his employer's documents.

80.    Berg conspired with Eastern to breach his fiduciary duty to use reasonable care in the performance of his duties by, among other things, participating in a scheme to order tens of millions of dollars of equipment from Eastern without advising anyone at Herbalife or Deloitte of such orders.  Berg also failed to disclose to Herbalife during the RFP process or the PAR approval process that the equipment subject to the bidding had already been ordered by Eastern.

81.    As a Vice President and officer of Herbalife, Berg owed Herbalife his undivided loyalty.  Berg breached his fiduciary obligation to provide Herbalife his undivided loyalty by conspiring with Eastern to the detriment of Herbalife.  Berg had a fiduciary obligation to disclose to Herbalife that Eastern had ordered tens of millions of dollars of equipment on behalf of Herbalife.  Instead, Berg secretly corresponded with Eastern, using non-Herbalife emails or devices, so that no one at Herbalife could discover that the BCDR order had been placed by Eastern.  Berg did not obtain any of the required approvals to make an equipment order.  During the RFP process, Berg never disclosed that Eastern had already ordered BCDR equipment from Dell.  Moreover, when Deloitte was suggesting other alternative BCDR solutions, Berg never disclosed that BCDR equipment had already been ordered.  All of these acts, among others, violated his duty of loyalty to Herbalife.

82.    Berg had a fiduciary duty to maintain the confidentiality of Herbalife's

17

400958382.1

documents.  In breach of this fiduciary duty, Berg conspired with Eastern and forwarded the Deloitte deck to Eastern 18 days after he was fired.  Berg gave Eastern confidential information regarding BCDR strategy.

83.   Herbalife was harmed by Berg's breach of his fiduciary duties and Berg's conduct was a substantial factor in causing Herbalife's harm.

84.   Defendants committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive Herbalife of its property, and their concealment was a substantial factor in causing Herbalife's harm. Herbalife is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial.

85.   WHEREFORE, Herbalife prays for relief as set forth below.

### THIRD CAUSE OF ACTION

**Breach of Contract**

**(Against Defendants)**

86.   Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

87.   Eastern entered into two agreements with Herbalife, the MSA and the NDA. True and correct copies of these agreements are attached hereto as Exhibits 2-3.

88.   Berg entered into two agreements with Herbalife, the Confidentiality Agreement and the Proprietary Information Agreement.  True and correct copies of these agreements are attached hereto as Exhibits 1 and 4.

89.   Herbalife has satisfied all of its obligations under the MSA, the NDA, the Confidentiality Agreement, and the Proprietary Information Agreement.

90.   By engaging in the misconduct and other wrongful acts set forth above, Eastern has materially breached the MSA and the NDA, and Berg has materially breached the Confidentiality Agreement and the Proprietary Information Agreement.

91.   As a result of Eastern's breaches, Herbalife has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, Eastern's invoice(s) for equipment return, financing charges, or restocking fees, among

**COMPLAINT**

400958382.1

other damages, all in an amount to be determined according to proof at the time of trial.

92.     WHEREFORE, Herbalife prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Conversion

### (Against Defendants)

93.     Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

94.     Herbalife has an advantage over its competitors because of its confidential, proprietary Confidential Information. Berg and Eastern were entrusted with the Confidential Information in connection with their employment and vendor status, respectively, at Herbalife. Berg and Eastern conspired to wrongfully convert the Confidential Information by improperly and secretly diverting business to Eastern for Defendants' financial gain.

95.     As a result of Defendants' wrongful conduct, Herbalife has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, Eastern's invoice(s) for equipment return, financing charges, or restocking fees, among other damages, all in an amount to be determined according to proof at the time of trial.

96.     Defendants committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive Herbalife of its property. Herbalife is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial, which is appropriate to punish and set an example.

97.     WHEREFORE, Herbalife prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### Declaratory Relief

### (Against Defendants)

98.     Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

19

**COMPLAINT**

99.     There is an actual and justiciable controversy between Herbalife, on the one hand, and Berg and Eastern, on the other hand, as to whether an agreement for BCDR services exists and, if so, whether money is owed under this agreement.

100.    Herbalife hereby seeks a judicial declaration that:

a.      Herbalife and Eastern did not enter into an enforceable agreement for Eastern to purchase BCDR equipment or perform any services related thereto on behalf of Herbalife;

b.      Herbalife has no obligation to pay Eastern for any invoices relating to the BCDR project, including HBL4000, 3141, or 3837, which represent Eastern's alleged spend for BCDR services, VMware licenses, and VMware tokens on behalf of Herbalife;

c.      Herbalife has no obligation to pay any equipment return, financing charges, or restocking fees charged to Eastern by Dell (or similar charges);

d.      Herbalife has no liability for terminating the at-will employment of Berg based on, among other things, Berg's conduct, as well as the after-acquired evidence doctrine, and that Berg is not entitled to any damages for the termination of his at-will employment; and

e.      Berg must indemnify Herbalife for all damages, losses, and attorneys' fees pursuant to paragraph 9 of the Confidentiality Agreement executed on January 6, 2020.

101.    A judicial determination of the parties' rights, obligations, and liabilities as set forth above is necessary and appropriate because Herbalife will continue to sustain substantial injury and damages if it does not obtain the judicial declarations set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Herbalife prays for relief as follows:

1.      For an injunction restraining and enjoining Defendants, their agents, servants, and employees, and all other persons acting in concert or participating with them:

**COMPLAINT**

400958382.1

a.     From disclosing or utilizing any confidential, proprietary, or protected information obtained from Herbalife including, but not limited to, information obtained during the RFP process, including the Deloitte "executive readout" deck.

b.     To return to Herbalife any confidential, proprietary, or protected information or other property or information misappropriated from Herbalife by Defendants.

2.     For compensatory and general damages according to proof;

3.     For special damages according to proof;

4.     For consequential damages according to proof;

5.     For prejudgment interest at the maximum legal rate;

6.     For punitive and exemplary damages according to proof;

7.     For costs of the proceedings herein;

8.     For attorney's fees as provided by the MSA, the NDA, and the Confidentiality Agreement;

9.     For such other and further relief as the Court deems just and proper; and

10.    For a jury trial pursuant to law.


Dated:   January 17, 2022              MANATT, PHELPS & PHILLIPS, LLP


                                       By: /s/ Robert H. Platt
                                           Robert H. Platt
                                           *Attorneys for Plaintiff*
                                           HERBALIFE NUTRITION
                                           INTERNATIONAL OF AMERICA, INC.

21

**COMPLAINT**

400958382.1