ROBERT H. PLATT (Bar No. CA 108533)
rplatt@manatt.com
DONALD R. BROWN (Bar No. CA 156548)
dbrown@manatt.com
ALEXANDRA N. HILL (Bar No. CA 313249)
ahill@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

Attorneys for *Plaintiff*
HERBALIFE INTERNATIONAL OF AMERICA, INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>EASTERN COMPUTER EXCHANGE, INC., a Connecticut corporation,<br><br>Defendant.<br><br>EASTERN COMPUTER EXCHANGE, INC., a Connecticut corporation,<br><br>Counter-Plaintiff,<br><br>vs.<br><br>HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation,<br><br>Counter-Defendant. | Case No. 2:22-cv-00347-ODW (AGRx)<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) FRAUDULENT CONCEALMENT;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) CONVERSION; and**<br>**(4) DECLARATORY RELIEF.** |

Plaintiff Herbalife International of America, Inc. ("Herbalife"), for its First Amended Complaint herein, states and alleges as follows:

## THE PARTIES

1. Plaintiff Herbalife is a Nevada corporation with its principal place of business in Los Angeles, California.

2. Defendant Eastern Computer Exchange ("Eastern") is a Connecticut corporation with its principal place of business in Westport, Connecticut.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. Section 1332 because there is complete diversity between Herbalife and Eastern, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. Venue is proper in this Court pursuant to 28 U.S.C. Sections 1391(b) and 1400 because a substantial part of the events giving rise to the claims occurred in this judicial district, and Herbalife's principal place of business is within this judicial district. Eastern and Herbalife entered into a Master Services Agreement ("MSA") providing that "any and all disputes arising under this Agreement shall be adjudicated in the appropriate state or federal court within California."  Eastern and Herbalife also entered into a Non-disclosure Agreement ("NDA") providing that "all disputes arising from or relating to this Agreement [shall be subject] . . . to the exclusive venue and jurisdiction of, the state and federal courts of Los Angeles County, California."

## FACTUAL BACKGROUND

### General Allegation

5. In furtherance of a fraudulent scheme, Eastern endeavored to create the fraudulent impression that Herbalife had agreed to order millions of dollars of computer equipment, including by creating a fraudulent purchase order, to reap Eastern millions of dollars in unearned business.

///

**Herbalife's Robust Procurement Policies and Procedures**

6. Herbalife is a global nutrition company that, through its network of independent distributors, provides consumers with nutrition solutions in the areas of weight management, sports nutrition, and health and wellness. Herbalife has been in operation for over 41 years and is currently a New York Stock Exchange publicly traded company operating in 95 markets globally.

7. Herbalife has robust and detailed written procurement policies and procedures that all employees must follow. Pursuant to these policies and procedures, Herbalife engages thousands of vendors to provide goods and services to Herbalife in a fair and consistent manner.

8. Herbalife's procurement policies and procedures contain extensive requirements. Herbalife's procurement procedures require, among other things, a number of written approvals by specified employees before a vendor can be awarded a contract. Before capital expenditures could be made through a third party vendor, Herbalife's policies and procedures required the following: 1) an approved Project Authorization Request or "PAR"—that is, approval of the proposed total expenditure on the overall project; 2) an approved purchase requisition or "PR"—that is, approval for the specific purchase tied to the project for which there is an approved PAR; and 3) an approved Purchase Order or "PO" for the vendor, tied to the project and purchase for which there is already an approved PAR and PR, which represents Herbalife's purchase commitment to the vendor.

9. The PAR, PR, and PO must all be approved in writing by the specifically designated employees at Herbalife with approval authority. Multiple approvals may be required, including by senior management and the Board of Directors ("Board"), depending on the size of the expenditure.

10. To ensure that all of these required procurement policies and procedures were followed, Herbalife used database systems to record and maintain PARs, PRs, and POs. For example, a PO cannot be issued using Herbalife's Oracle database unless all of

the required approvals have been obtained for both the associated PAR and PR.

11. The Oracle database sequentially assigns a unique number to a PO based on the date of creation of the PO. Once all of the requisite approvals are obtained, and a PO is able to be issued, an employee of Herbalife typically sends a copy of the PO to the vendor from the Oracle system. All PARs, PRs, and POs, including all written authorizations for such documents, are stored on Herbalife database systems.

12. These procurement procedures and procedures were designed by Herbalife to promote transparency and to ensure that projects being bid were within the company's budget, met the company's stated needs, and were subject to fair competitive bidding.

### Eastern Signs a MSA

13. On information and belief, Eastern is a technology company based in Westport, Connecticut. Eastern is what is known as a "value added reseller" or "VAR," which partners with original equipment manufacturers ("OEMs") such as Dell Technologies, to resell computer equipment to end users such as Herbalife.

14. In late 2019, Herbalife's then-Chief Technology Officer introduced Eastern, including Eastern's president, Brendan Lynch ("Lynch:), to Herbalife, and Eastern became an Herbalife vendor for the first time. Herbalife and Eastern signed the NDA, effective December 13, 2019, strictly prohibiting the parties from using any confidential information of the other. *See* Exhibit 1. Herbalife and Eastern also signed the MSA in January 2020 dated December 19, 2019. *See* Exhibit 2.

### Herbalife Issues 21 Purchase Orders to Eastern

15. Starting January 2020 through April 2021, Herbalife entered into 21 different POs with Eastern and paid Eastern over $15 million in connection with those POs. Eastern, thus, was well aware of the necessity of Herbalife issuing a PO before any payments could and would be made by Herbalife.

### Eastern Receives a Purchase Order to Conduct an Analysis of Herbalife's Applications

16. Business continuity and disaster recovery ("BCDR") generally refers to a

strategy to reduce the risk of technology outages that could disrupt a business. Herbalife retained Eastern in or around April 2020, pursuant to a PO, to perform an "application impact analysis" ("AIA") of Herbalife's applications, including those that implicate BCDR. Herbalife paid Eastern for the AIA in accordance with the PO issued for it.

17. While Eastern was conducting the AIA, Eastern provided Herbalife a deck with its BCDR design recommendations, on or around June 18, 2020. The June 18, 2020 Eastern deck made two recommendations for potential BCDR solutions for Herbalife's computer systems located in Salt Lake City and Winston-Salem. In the deck, Eastern stated it would make a proposal "in 4 weeks" to address the BCDR strategy for both Salt Lake City and Winston-Salem. Notably, both design solutions recommended by Eastern would have Herbalife commit significant resources to an on-premises, primarily hardware-focused solution (i.e., use vendors such as Eastern to purchase hardware and equipment from OEMs like Dell), rather than a cloud-based solution.

### Herbalife's Board of Directors Reviews BCDR Strategy

18. During the summer and into the fall of 2020, a team of Herbalife employees prepared a presentation for Herbalife's Board of Directors (the "Board") on BCDR. The presentation addressed various BCDR recommendations for both the Salt Lake City and Winston-Salem locations. The purpose of the presentation to the Board was to present management's recommendations related to BCDR and to seek Board approval for funding a BCDR project, consistent with Herbalife's policies and approval process.

19. The presentation requested the Board to approve $40 to $50 million to address BCDR. The presentation noted that the "cost projections represent estimated maximum spend, ***as no negotiating has been initiated*** (of which $20 million is [capital expenditures] and the remainder is maintenance and support)." (Emphasis added.) At this Board meeting, the Board approved a preliminary budget to address BCDR.

### A Meeting with Eastern on October 28, 2020

20. On October 28, 2020, a meeting was held at Herbalife's Torrance office and attended by Eastern (Lynch and Marty O'Brien ("O'Brien")), as well as Gerry Berg

4

**FIRST AMENDED COMPLAINT**

("Berg"), Herbalife's VP of Infrastructure and Operations, and Peter Bray ("Bray"), Herbalife's Senior Director of Strategy and Governance. Because Bray had been recently hired and had been primarily working remotely at Herbalife, the meeting was Bray's first time in Herbalife's office, as well as Bray's first-time meeting Berg, Lynch, and O'Brien in person. Bray was unaware of the purpose of the meeting.

21. As of October 28, 2020, there was no PAR, PR, or PO issued for the BCDR project; therefore, neither Bray nor Berg had any authority to approve Eastern ordering any equipment for the proposed BCDR project.

22. Nevertheless, Eastern (Lynch and O'Brien) raised the possibility of Eastern pre-ordering BCDR equipment during the October 28, 2020 meeting. More specifically, Eastern suggested that it purchase equipment from Dell on behalf of Herbalife before Herbalife had approved a PAR, PR, or PO for the equipment. During this meeting, Bray told Lynch and O'Brien that he wouldn't take such an approach, but that if Eastern nevertheless did so, and chose to pre-order BCDR equipment, that such a decision would be "on them." Berg and Bray advised Lynch and O'Brien that they were not authorized to approve any BCDR purchase. Berg and Bray explained that the approval would have to go through the proper procurement process at Herbalife.

23. Although the Board approved the initial spend, Herbalife's policies nevertheless require employees to follow its required approval process, which includes a PAR, PR, and PO. Berg and Bray knew well that no one could bypass this process and approve a "verbal order" for the purchase of the BCDR equipment. This was especially so given the significant size of the expenditure. Eastern likewise knew that it must receive a PO, in writing, from Herbalife, just as it had many times for prior orders.

24. While Eastern now claims that Bray placed a "verbal order" for tens of millions of dollars of BCDR equipment at this October 28 meeting, without a PAR, PR, or PO, this contention is belied by many facts. Berg and Bray each steadfastly deny that Bray approved a verbal order at the October 28 meeting. Bray was not an executive at Herbalife and had just recently joined the company. Bray certainly could not unilaterally

5

**FIRST AMENDED COMPLAINT**

ignore Herbalife's procurement policies and procedures and place a verbal order worth tens of millions of dollars.

25. On October 30, 2020, Eastern, without Herbalife's knowledge or authorization, placed an order in excess of $20 million worth of computer hardware from Dell, supposedly for Herbalife's BCDR project.

26. It is abundantly clear that Eastern understood that they did not have the authority to proceed with the order and spend millions of dollars on the BCDR project. There is no evidence confirming or even mentioning this supposed verbal agreement anywhere at Herbalife. Herbalife has been unable to locate even a single email evidencing an agreement between Eastern and Herbalife to purchase the BCDR equipment, and there is no written agreement to this effect. In fact, the opposite is true— documents evidence that Eastern was well-aware of both Herbalife's procurement process and attendant requirements of a written agreement authorizing such a purchase and that the BCDR plan had not yet been approved at Herbalife. It is inconceivable that a deal worth tens of millions of dollars, potentially involving dozens of Herbalife employees, would leave no paper trail at Herbalife. It appears that all communications, if any, regarding Eastern's ordering of the equipment from Dell were conducted on non-Herbalife devices in an apparent effort to conceal the transaction.

**Herbalife Issues a RFP for BCDR Strategy**

27. Herbalife, unaware that Eastern had placed an order for certain BCDR equipment, began the formal process of searching for a vendor to fulfill its BCDR needs after the Board approved an initial BCDR spend. As required by its policies and procedures, Herbalife conducted a request for proposals ("RFP") process in November 2020 for the BCDR project. Herbalife invited vendors to bid on the BCDR project, including Eastern.

28. In November 2020, Herbalife provided the vendors participating in the RFP with highly confidential information about its computer systems, including information related to data processing, data protection, and business continuity capabilities, to allow

the vendors to fully diagnose Herbalife's needs and provide bids to address BCDR strategy. The bid for the BCDR project was for the entire project, not phases.

29. At no time during the RFP process did Eastern ever mention that Eastern had already allegedly been awarded all or part of the BCDR project, nor did Eastern ever mention that it had already ordered equipment from Dell. To the contrary, Eastern acted as if no equipment had been ordered, and Eastern prepared and submitted a response to the RFP.

30. Indeed, Eastern's full participation in the RFP process for BCDR—from November 2020 through January 2021—undermines its position that Eastern had some type of verbal commitment from Herbalife in October 2020 to order the BCDR equipment. Even more perplexing, is that Eastern now claims that Herbalife informed Eastern that it had won the RFP in mid-December 2020—which, again, runs contrary to Eastern's decision to order tens of millions of dollars of equipment from Dell in October 2020. Eastern's contentions are further belied by email communications between Eastern and Herbalife, which demonstrate that, as of January 2021, there were still discussions between Herbalife and Eastern regarding Eastern's potential bid for the entire BCDR project. Thus, it was clear based on Eastern's conduct that Eastern had not been announced as the "winner" of the RFP prior to October 2020 or at any time whatsoever.

**Herbalife Circulates BCDR PAR in January 2021, Further Demonstrating That There Was No Approval of the BCDR Project**

31. In November 2020, after the equipment had been ordered, Eastern provided information to Herbalife to be used in drafting a PAR to obtain approval for the BCDR project. Such activity demonstrates Eastern's knowledge of Herbalife's procurement policies and procedures.

32. On January 20, 2021, after the PAR had been drafted with Eastern's input, it was submitted for approval.

33. Given the size of the BCDR project, the PAR required written approval from 15 employees, up to and including both the President, as well as the

7

**FIRST AMENDED COMPLAINT**

401149015.4

Chairman/CEO.

34. The PAR did not receive approval from all 15 individuals required and, therefore, there was no authorization from Herbalife for Eastern or any vendor to proceed with the BCDR project.

### Herbalife Terminates the RFP Process

35. Herbalife decided to terminate the RFP without awarding the contract to any vendor in January 2021 to further assess the proposed BCDR project design. Later that month, Herbalife decided to engage a neutral third-party to review and assess the proposed BCDR project design.

36. That same month, Eastern and the other bidders were advised that the RFP process was put on hold. No vendor was selected, and the bidding process was terminated to avoid a tainted process and allow Herbalife to further scrutinize its BCDR solution options.

### A Fraudulent PO

37. Dell asked Eastern for proof that Herbalife had committed to the multi-million dollar purchase of computer hardware through Eastern from Dell for Herbalife's BCDR strategy.

38. On February 23, 2021 at 2:58 p.m., Lynch sent the fraudulent PO to a Senior Vice President at Dell, for the purpose of falsely confirming Herbalife's BCDR equipment order.

39. The fraudulent PO does not exist anywhere in any of Herbalife's files. The fraudulent PO is also not in Herbalife's Oracle database and was not transmitted through Herbalife's email systems to anyone at Herbalife or to any third party. Moreover, there is no record of any actual PO being issued to Eastern on or around October 30, 2020, nor is there any record of any PO being issued to Eastern for any project close to $20 million, including BCDR. This is not surprising, as there was never an approved PAR or PR issued for the BCDR order; thus, there could not have been an approved PO issued for any equipment order related to BCDR.

40. The fraudulent PO included the PO number 1102051762. This PO number was originally issued by Herbalife to Eastern for a completely different project. The original PO was redacted, and new language for the fraudulent PO inserted, to disguise the fact that the fraudulent PO was in fact fabricated. Though not immediately apparent at first blush, upon closer review, the fraudulent PO was also riddled with errors, further underscoring its fraudulent nature. The Payment Terms on page 1 ("60 on Delivery in Full") do not match the Payment Terms on pages 2 and 3 ("30"). Under the word "Release" on the front page, the text "Page 1 of 3" is missing, but would be included on Herbalife POs. The PO contains vague language rather than identifying specific equipment that would be ordered. Nevertheless, this fraudulent PO was delivered by Lynch, the President and CEO of Eastern, to Dell as evidence that Eastern had an "agreement" with Herbalife to order the Dell equipment.

### Herbalife Hires Deloitte to Reevaluate Herbalife's BCDR Needs

41. In February 2021, Herbalife hired Deloitte to analyze its BCDR needs. Deloitte was retained to make independent recommendations without any financial incentives. Throughout the month of March 2021, confidential meetings occurred between representatives of Deloitte and Herbalife to evaluate the proposed BCDR project. It was made clear to participants that these meetings and the information shared during these meetings with Deloitte were highly confidential. Eastern was not invited to, and did not attend, these meetings.

42. At these meetings between Herbalife and Deloitte, various alternative BCDR solutions were discussed. No one who attended the meetings with Deloitte was advised that Eastern had already been awarded the BCDR contract, or that Eastern had already ordered the BCDR equipment.

43. At these meetings between Deloitte and Herbalife, different solutions regarding BCDR were discussed, including a cloud-based solution that would render the Eastern equipment purchase unnecessary.

44. On March 31, 2021, Deloitte sent an "executive readout" PowerPoint deck

to the Chief Information Officer, who then forwarded the deck to her direct reports the next day. The executive readout makes clear that Deloitte was recommending that Herbalife consider options other than a hardware-heavy BCDR solution that would rely on vendors like Eastern and Dell.

45. Eastern believed that, with Deloitte's involvement, a different BCDR solution might be selected that would render Eastern's equipment purchase unnecessary. Lynch improperly obtained a copy of the confidential Deloitte deck dated March 31, 2021. On April 27, 2021 at 9:27 p.m., Lynch sent the deck to Dell, in breach of the MSA and NDA.

### Herbalife Discovers the Fraudulent PO

46. Herbalife was unaware of the fraudulent PO or any order for BCDR equipment placed by Eastern. In July 2021, a Dell executive reached out to Herbalife requesting to speak about a "situation" that had arisen with Eastern.

47. The Dell representative explained that Dell had been informed by Eastern that Herbalife had placed a "firm order" via a PO numbered 1102051762 for BCDR equipment. The Dell representative further explained that Dell had built over $20 million worth of computer equipment based on Eastern's representations. The Dell representative also informed Herbalife that Eastern had refused to accept delivery or pay for the BCDR equipment, causing a dispute between Dell and Eastern. At Herbalife's request, Dell sent the PO numbered 1102051762—*the fraudulent PO*—to Herbalife, which led to Herbalife's discovery of the fraud.

### Eastern Settles Its Dispute with Dell

48. Dell and Eastern entered into a settlement and release agreement in which Eastern released Dell from any and all claims in connection with Eastern's BCDR order with Dell allegedly on Herbalife's behalf. Dell did not charge Eastern for the equipment nor did it charge Eastern for any "restocking fees."

### Eastern Seeks Compensation

49. Despite its fraudulent acts, and despite being released from all claims by

Dell, Eastern seeks to benefit from its fraudulent conduct by charging Herbalife fees in connection with its fraudulent BCDR order from Dell. Eastern now seeks millions of dollars from Herbalife in payment for the BCDR project, including equipment and labor. Eastern also has demanded that Herbalife pay $2,267,476.86 to account for purported "restocking fees," as well as other alleged fees, such as "financing fees," allegedly charged by Dell to return the equipment Eastern ordered without authorization in October 2020. No such fees were charged.

50. Eastern is also seeking payment for $1,074,915.62 in tokens and licenses Eastern purchased from a company called VMware allegedly on Herbalife's behalf. The agreement entered into between Eastern and Herbalife specifically provides that Herbalife is only responsible to pay for such tokens and licenses when they are ordered pursuant to a purchase order. However, Herbalife has never issued a PO (i.e., Herbalife has never given corporate approval) to purchase any of the VMware tokens or licenses for which Eastern is now seeking payment; therefore, no money is due or owing to Eastern for the purchase of such tokens.

**Eastern Has Breached the NDA and MSA with Herbalife
by Engaging in Fraudulent and Unethical Conduct**

51. Paragraphs 2(B) and 5(v) of the MSA between Herbalife and Eastern state in pertinent part:

> Contractor [i.e., Eastern] hereby agrees to perform the Services in a conscientious and professional manner and to the best of Contractor's ability . . .
>
> [Eastern] will perform the Services in a workmanlike manner.

52. The conduct alleged herein and above breaches Eastern's contractual obligation under the MSA to perform its services in a conscientious, workmanlike, and professional manner to the best of Eastern's ability.

53. On January 14, 2022, Herbalife advised Eastern that it was exercising its audit and inspection rights under the MSA to investigate the allegations described herein. Herbalife provided a detailed list of the documents it sought in the audit. Eastern's

refusal to provide documents is a breach of the MSA. Paragraph 21 states:

> AUDIT AND INSPECTION RIGHTS. During the Term of this Agreement and for one year thereafter, Herbalife, or Herbalife's designated agents, shall have the right from time to time, on reasonable notice and during business hours, to inspect and audit Contractor's books, records, and other documents as necessary to verify Contractor's compliance with the terms and conditions of this Agreement. Further, Contractor shall provide Herbalife with all necessary documents to verify Contractor's compliance with the terms and conditions of this Agreement.

54. Furthermore, the Deloitte meetings, including the PowerPoint deck, qualify as "Confidential Information" under the NDA signed by Herbalife and Eastern. Paragraph 2, "Confidential Information," of the NDA broadly defines Confidential Information as:

> . . . any nonpublic, confidential or proprietary information that the Disclosing Party or any of its representatives, employees, agents, affiliates, or financial, legal, or accounting advisors (together, the "Representatives") make available to the Receiving Party in connection with the Services. Such Confidential Information shall include, but is not limited to the following: business and strategic plans, market analysis, business summaries, business processes, financial forecasts and reports, product formulas, ingredients, clinical studies, prospective product designs, pricing policies and methods, vendor and business partner identities, purchasing methods and Information, operational material and manuals, financial data, proposed trademarks or service marks, patent applications, trade secrets, technical and engineering data, drawings, models, software products, and design and technical specifications.

55. Paragraph 5 of the NDA between Herbalife and Eastern states, in pertinent part, that Eastern (i.e., the "Receiving Party") will:

> (a) not use Confidential Information for any purpose whatsoever other than evaluation and/or facilitating discussions between the Parties; (b) not copy the Confidential Information, reproduce it in any form or store it in a retrieval system or database without the prior written consent of the Disclosing Party, subject to the exceptions contained herein; (c) keep in confidence all Confidential Information received, and not distribute, disclose, or disseminate such Confidential Infonnation [sic] in any way to anyone except to the minimum number of Representatives of the Receiving Party with a need to know and who are involved in a consideration or evaluation of the Confidential Information; *provided however*, that such Representatives have been advised of the obligations to

> protect the Confidential Infonnation [sic], and *provided further*, that notwithstanding the foregoing, the Receiving Party shall be liable for any misuse of such Confidential Infonnation [sic] by such Representatives; (d) use reasonable care to protect the Confidential Information, and in no event use less than the same degree of care as the Receiving Party safeguards its own Confidential Information of like kind . . . .

56. Herbalife is informed and believes that Eastern used confidential information gained before, during, and after the bidding process which was a breach of the NDA. Herbalife is informed and believes that Eastern conspired with an employee of Herbalife to orchestrate a situation in which Eastern would ultimately be able to win the BCDR bid and be able to pay Dell for its unauthorized order.

## FIRST CAUSE OF ACTION

### Fraudulent Concealment

57. Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

58. Eastern falsely and fraudulently concealed from Herbalife that they had secretly purchased equipment without advising Herbalife and concealing such activities from Herbalife (nor could Herbalife have discovered them).

59. For example, Eastern did not send a single email to any Herbalife email address confirming or even mentioning that the BCDR equipment had been ordered. Instead, on information and belief, all communications were done secretly so that Herbalife would not uncover the fact that equipment had been ordered.

60. In fact, in November 2020, O'Brien and Walter Rival ("Rival") of Eastern participated in email communications with numerous Herbalife employees where it was confirmed in writing that no equipment had yet been ordered. O'Brien or Rival never raised the issue that tens of millions of dollars of equipment had already been ordered.

61. Eastern also participated in the RFP process in an effort to win the BCDR project. Eastern had numerous communications with Herbalife in an effort to complete its RFP for the BCDR project. At no time during the RFP process did Eastern disclose that it

had already ordered the equipment for which it was submitting a bid.

62. In addition, Eastern provided input for the creation of the PAR, which is a prerequisite for awarding a contract to a vendor. While Eastern worked on the PAR, Eastern never mentioned that it had already allegedly been awarded the contract for the BDCR project or that it had ordered any equipment.

63. Eastern attempted to create the fraudulent impression that Herbalife had agreed to order by BCDR equipment by creating a fraudulent PO. Eastern knew its actions to be fraudulent, and Eastern concealed the truth from Herbalife with the intent to defraud and deceive Herbalife and with the intent to induce Herbalife to act in the manner herein alleged.

64. At the time of the fraudulent omissions by Eastern, and at the time Herbalife engaged in the actions herein alleged, Herbalife was ignorant of the actions being undertaken by Eastern, believed that Eastern was acting in the best interests of Herbalife, and relied upon Eastern by continuing to hire and compensate Eastern.

65. Herbalife did not discover the fraudulent concealment advanced by Eastern until Dell contacted Herbalife in the summer of 2021.

66. Eastern intended to deceive Herbalife by concealing its fraudulent activities, including the fraudulent PO. Eastern was careful not to create a "paper trail" of its fraudulent conduct. There are no emails on the Herbalife computer system referencing or even mentioning the multi-million dollar order that Herbalife allegedly placed with Eastern. Eastern's concealment caused significant damage to Herbalife in an amount to be proven at trial.

67. Throughout 2020 and 2021, Eastern acted as if it had not placed an equipment order with Dell. Eastern participated in various BCDR proposals and presentations, the RFP process, and even the PAR drafting process without ever mentioning that it had already placed the equipment order.

68. Had Herbalife known of the actions being undertaken by Eastern, Herbalife would have behaved differently.

14

**FIRST AMENDED COMPLAINT**

401149015.4

69. As a result of Eastern's wrongful conduct, Herbalife has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, Eastern's invoice(s) for equipment return, financing charges, and/or restocking fees, among other damages, all in an amount to be determined according to proof at the time of trial.

70. Eastern committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive Herbalife of its property, and its concealment was a substantial factor in causing Herbalife's harm. Herbalife is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial.

71. WHEREFORE, Herbalife prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### Breach of Contract

72. Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

73. Eastern entered into two agreements with Herbalife, the MSA and the NDA. True and correct copies of these agreements are attached hereto as Exhibits 1-2.

74. Herbalife has satisfied all of its obligations under the MSA and the NDA.

75. By engaging in the misconduct and other wrongful acts set forth above, Eastern has materially breached the MSA and the NDA.

76. As a result of Eastern's breaches, Herbalife has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, Eastern's invoice(s) for equipment return, financing charges, or restocking fees, among other damages, all in an amount to be determined according to proof at the time of trial.

77. WHEREFORE, Herbalife prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### Conversion

78. Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

15

**FIRST AMENDED COMPLAINT**

401149015.4

79. Herbalife has an advantage over its competitors because of its confidential, proprietary Confidential Information. Eastern was entrusted with the Confidential Information in connection with its vendor status at Herbalife. Eastern wrongfully converted Confidential Information by improperly and secretly diverting business to Eastern for its financial gain and sharing Herbalife's Confidential Information with third parties.

80. As a result of Eastern's wrongful conduct, Herbalife has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, Eastern's invoice(s) for equipment return, financing charges, or restocking fees, among other damages, all in an amount to be determined according to proof at the time of trial.

81. Eastern committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive Herbalife of its property. Herbalife is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial, which is appropriate to punish and set an example.

82. WHEREFORE, Herbalife prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Declaratory Relief

83. Herbalife incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

84. There is an actual and justiciable controversy between Herbalife and Eastern as to whether an agreement for BCDR services exists and, if so, whether money is owed under this agreement.

85. Herbalife hereby seeks a judicial declaration that:

   a. Herbalife and Eastern did not enter into an enforceable agreement for Eastern to purchase BCDR equipment or perform any services related thereto on behalf of Herbalife;

   b. Herbalife has no obligation to pay Eastern for any invoices relating to the BCDR project, including HBL4000, 3141, or 3837, which represent Eastern's alleged spend for BCDR services, VMware licenses, and VMware tokens on behalf of Herbalife; and

   c. Herbalife has no obligation to pay any equipment return, financing charges, or restocking fees charged to Eastern by Dell (or similar charges).

 86. A judicial determination of the parties' rights, obligations, and liabilities as set forth above is necessary and appropriate because Herbalife will continue to sustain substantial injury and damages if it does not obtain the judicial declarations set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Herbalife prays for relief as follows:

 1. For an injunction restraining and enjoining Eastern, its agents, servants, and employees, and all other persons acting in concert or participating with them:

   a. From disclosing or utilizing any confidential, proprietary, or protected information obtained from Herbalife including, but not limited to, information obtained before, during, or after the RFP process, including the Deloitte "executive readout" deck.

   b. To return to Herbalife any confidential, proprietary, or protected information or other property or information misappropriated from Herbalife by Eastern.

 2. For compensatory and general damages according to proof;

 3. For special damages according to proof;

 4. For consequential damages according to proof;

 5. For prejudgment interest at the maximum legal rate;

 6. For punitive and exemplary damages according to proof;

 7. For costs of the proceedings herein;

 8. For attorney's fees as provided by the MSA and the NDA;

 9. For such other and further relief as the Court deems just and proper; and

10. For a jury trial pursuant to law.

Dated: May 16, 2022

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ Robert H. Platt
  Robert H. Platt
  *Attorneys for Plaintiff*
  HERBALIFE NUTRITION INTERNATIONAL OF AMERICA, INC.

**FIRST AMENDED COMPLAINT**

401149015.4